******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JOHN MALLOZZI
## (AC 46060)

Elgo, Cradle and Prescott, Js.

*Syllabus*

The defendant, who had been convicted of fourteen counts each of false statement in absentee balloting and forgery in the second degree, appealed to this court. The defendant, who was the Democratic city chairman for the city of Stamford during the 2015 municipal election cycle, regularly appeared at the Stamford town clerk's office to "check on" ballots. L, the Republican town clerk, admitted that she gave certain absentee ballots to the defendant and his associates, even though delivering a ballot to an individual other than the applicant was improper. Other individuals in L's office accepted applications from the defendant, even though many of them should have been rejected because they were not filled out properly. P worked in the town clerk's office under L's supervision, and she prepared ballot sets for the defendant to pick up and would write the defendant's initials on the applications. After receiving a complaint, B, an investigator for the State Elections Enforcement Commission, conducted an investigation, which revealed a "scheme" between the defendant and L involving the submission of thirty-one fraudulent absentee ballot applications and twenty-six fraudulent absentee ballots to the Stamford town clerk's office. During the bench trial in the present case, the trial court directed the state to file an amended information to add an individual name for each count of false statement in absentee balloting. K, a handwriting and document examination expert, testified on behalf of the state. K compared handwriting exemplars given by the defendant to the handwritten information on the ballot applications and opined that there were indications that the questioned signatures and the defendant's exemplars shared common ownership. The trial court denied defense counsel's request to disclose a handwriting expert to rebut K's opinions, as well as his motion to strike P's testimony, which was provided during the state's case-in-chief, after she asserted her fifth amendment privilege against self-incrimination when the defense called her as a witness in the defendant's case. The court found the defendant guilty of all charges, and subsequently issued a memorandum of decision denying the defendant's motion to dismiss. *Held*:

1. The defendant's claim that the evidence was insufficient to support his conviction, which was based on his claim that the state failed to prove beyond a reasonable doubt that he authored the forged signatures, was unavailing: although the defendant argued that K's testimony that it was highly probable that the defendant's signature exemplars and the

questioned documents shared a common author was not a proper evidentiary basis for guilt as to each individual ballot, defense counsel did not ask at trial that the evidence as to each ballot be limited only to the counts specifically identifying each ballot, and he did not argue before the trial court that K's opinion was an improper consideration in determining the defendant's guilt as to each count; moreover, K's testimony was not the only evidence of the defendant's guilt, as L testified that she gave ballots to the defendant and his associates, P confirmed that she prepared ballots for the defendant to pick up and that she put his initials on those ballots, and B testified that the ballots that bore the defendant's initials appeared to share similar handwriting.

2. The defendant could not prevail on his claim that the trial court improperly permitted the state to amend its information during trial to include the names of the alleged victims with respect to each count of false statement in absentee balloting, which was based on his claim that the state did not provide good cause for such an amendment, pursuant to the applicable rule of practice (§ 36-18): the trial court did not permit the state to amend its information, it directed it to do so, and, accordingly, the state was not required to show good cause; moreover, the amendment directed by the court, which was specifically requested by defense counsel earlier in the trial, did not charge an additional or different offense, and it did not prejudice any substantive rights of the defendant, rather, the amendment narrowed the charges against the defendant, allowing defense counsel to focus on the ballots identified in the amended information; furthermore, the identities of all of the victims were known to the defendant because their names were listed in the arrest warrant affidavit and were contained in K's case notes, which were disclosed prior to trial.

3. The trial court properly denied defense counsel's request during trial to obtain and disclose a handwriting expert witness to rebut the state's expert witness: our rules of practice (§§ 40-13 and 40-26 (2)) require a defendant to disclose to the state, within forty-five days of a written request, the names of any witnesses the defendant intends to call at trial, in addition to any reports or statements of experts made in connection with the case, and the failure to comply with those rules may result in the preclusion of specific evidence; moreover, the defendant was aware of the state's reliance on K's opinions since he was arrested, as K's opinions were referenced in the arrest warrant affidavit, and, nevertheless, the defense did not seek to discuss K's opinions with him or disclose its own expert to rebut them, and, accordingly, this court rejected the defendant's argument that he was "sandbagged" by K's testimony; furthermore, defense counsel did not disclose the name of his intended expert, he did not proffer a curriculum vitae or a summary of the expert's proposed opinion, and it was unlikely that a rebuttal expert could render an opinion in the one hour indicated by defense counsel as K had spent years examining the evidence in this case and

provided three days of testimony, and the rebuttal expert's testimony would then have necessitated a response by K, which would have disrupted and delayed the proceedings in a manner not contemplated by defense counsel.

4. The defendant could not prevail on his unpreserved claim that his right to due process was violated by the lack of a rule of practice that the state disclose the substance of any expert opinion on which it intended to rely at trial; the defendant's claim essentially was alleging a constitutional right to discovery, and, because a criminal defendant has no general constitutional right to discovery, the defendant's claim was not of constitutional magnitude alleging the violation of a fundamental right, and, accordingly, failed under the second prong of the test set forth in *State* v. *Golding* (213 Conn. 233).

5. The defendant's claim that his right to confrontation under the sixth amendment to the United States constitution was violated because the trial court declined to strike P's testimony was unavailing: the defense had ample opportunity to cross-examine all aspects of P's testimony that were elicited on direct examination, defense counsel questioned P relating to the investigation by the State Elections Enforcement Commission in this case, her various communications with B and the written statement that she provided to him, and, thus, the defense had an unrestricted opportunity to explore on cross-examination any motive or bias that P may have had and to impeach any portion of her testimony.

6. The defendant could not prevail on his claim that the trial court improperly denied his motion to dismiss on the ground of selective prosecution, which was based on his claim that the court ignored the allegations of a "scheme" allegedly involving several individuals, all of whom, the defendant contends, were similarly situated, and that the only difference between him and those other individuals was that he was the only one who exercised his right to counsel: the defendant ignored the difference between his conduct and that of the other individuals whom he claims were similarly situated because the defendant was the one who fraudulently filled out the absentee ballot applications and forged the signatures of the victims; moreover, the defendant's claim was devoid of any argument of animus or invidious discrimination on the part of the state.

Argued January 29—officially released June 4, 2024

*Procedural History*

Amended information charging the defendant with fourteen counts of the crime of false statement in absentee balloting and fourteen counts of the crime of forgery in the second degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number one, and tried to the court, *Randolph, J.*;

thereafter, the court, *Randolph, J.*, denied the defendant's motions to strike certain testimony and to dismiss; judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Stephan E. Seeger*, with whom, on the brief, was *Igor Kuperman*, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attorney, *Laurence G. Tamaccio*, assistant state's attorney, and *Michael C. Bivona*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

CRADLE, J. The defendant, John Mallozzi, appeals from the judgment of conviction, rendered following a court trial, of fourteen counts of false statement in absentee balloting in violation of General Statutes § 9-359a and fourteen counts of forgery in the second degree in violation of General Statutes § 53a-139 (a) (3). On appeal, the defendant claims that (1) the evidence presented at trial was insufficient to support his conviction; (2) the court improperly permitted the state to amend its long form information in the middle of trial; (3) the court improperly denied defense counsel's request to obtain and disclose, in the middle of trial, an expert witness to rebut the state's expert witness; (4) his right to due process was violated by the lack of a requirement that the state disclose the substance of any expert opinion upon which it intended to rely at trial; (5) the court improperly denied his motion to strike the testimony of a witness, proffered by the prosecutor during the state's case-in-chief, after that same witness invoked her fifth amendment privilege against self-incrimination when she was called to testify by the defense; and (6) the court improperly denied his motion to dismiss on the ground of selective prosecution. We affirm the judgment of the trial court.

The following facts, as set forth by the trial court, and procedural history are relevant to the defendant's claims on appeal. "The city of Stamford . . . held municipal elections in 2015. On the ballot were candidates for the Board of Representatives, the Board of Education and the Board of Finance. The Stamford town clerk's office was responsible for maintaining election records. During elections, the town clerk's office issued absentee ballot applications and ballot sets (referred to as 'ballots').

"In 2015, Donna Loglisci was the Republican town clerk, an elected public official. She was elected to the office in 2001 and reelected numerous times. She last served as town clerk in 2017. She was also the chairman of the Republican Party in Stamford for six years before being elected town clerk.

"During the municipal election of 2015, registered voters who wanted an application for an absentee ballot could request one from the town clerk's office. A registered voter could also obtain an absentee ballot application from their party of registration or online from the Secretary of the State's office. After filling out the application, the voter could return the application to the town clerk's office by mail or by dropping it off at the office.

"In 2015, there was an 'election office' within the town clerk's office. Applications that arrived at the town clerk's office were clocked and date stamped. The town clerk's office would then place a district number and a voter number on the applications. After checking the applications for completeness, the office would mail or hand out the actual ballot package to the voter. Absentee ballots had to be returned to the town clerk's office by 8 p.m. on election evening. Absentee voting was permitted for thirty days prior to the election.

"The ballot package, that is, the ballot set, contained a ballot, an inner and an outer envelope and instruction forms. When mailing the ballot back to the town clerk's office, the voter would place the ballot into the inner envelope and then place the inner envelope into the outer envelope. The inner envelope had to be signed and dated by the voter. The ballots could then be mailed or delivered in person to the town clerk's office.

"When the ballots arrived at the town clerk's office, they were date stamped. The ballots were kept in banker's boxes, marked by district numbers, and placed in vaults in the town clerk's office until election day. The town clerk's office would not open the envelopes containing the ballots. The office of registrar of voters, a public office, would open the envelopes on election day. The office would count the votes and the Secretary of the State's office would have to record and certify a vote count.

"After the registrar retrieved the banker's boxes containing ballots, the registrar marked its own books, thereby identifying absentee ballot voters. The books identifying voters who cast absentee ballots were then placed at the polls on election day. Voters whose names and addresses were listed in the books would not be allowed to vote in person.

"During the 2015 election cycle, the defendant, who was the [Stamford Democratic City Committee] chairman, was regularly in the town clerk's office 'checking on ballots.' Loglisci had known the defendant through his political activity for over twenty years. On at least one occasion, the defendant asked whether he could get ballots if he had ballot applications from people who could not vote in person. The office policy allowed anyone to deliver applications to the town clerk's office. But those applications had to be signed by the voter. If a person requesting a ballot was not the applicant,

the ballot should have been mailed to the applicant's address. To deliver ballots to [an individual] other than the applicant was improper. . . . Loglisci admitted she gave ballots to [individuals] other than the applicants . . . she provided ballots to the defendant . . . .

"Loglisci's office also received applications from the defendant. Her office accepted applications even though many of them should have been rejected because they were not filled out properly. Diane Pesiri worked in the town clerk's office under . . . Loglisci. She prepared ballot sets for the defendant to pick up. When employees in the office either saw or were told that [the defendant] delivered applications, Pesiri would write the initials of [the defendant], JM, or on one occasion JL, on the upper right-hand corner of the applications. However, the initials JM or JL placed in the upper right-hand corner did not necessarily mean that Pesiri saw the defendant come into the office to deliver applications.

"On multiple occasions, the town clerk's office processed applications that did not contain required information. The office had the authority to reject ballot applications, including applications containing only the name and address of the applicant. Moreover, the town clerk had the authority to reject applications that contained only the name, address and signature of the applicant. All applications required that a box be checked stating the reason the applicant wanted an absentee ballot. Loglisci accepted numerous incomplete and invalid applications. Among them were applications on which the putative applicant listed no reason for wanting to receive an absentee ballot. Compounding the town clerk's missteps, the office would enter into its logbook the reasons an applicant wanted an absentee ballot when the putative applicant failed to check off any reason. In other words, the town clerk's office sometimes created reasons when the applications contained none.

"Loglisci admitted that she broke the law when she gave ballots to people who were not applicants. She handed ballot sets to a Mr. Figueroa who was not an applicant. She handed ballot sets to a Mr. Giraldo who was not an applicant. Both were associates of the defendant. On more than one occasion she provided ballot sets to the defendant. . . .

"Isen Hoti became a registered voter in the early 2000s. At the time of trial, he remembered voting two or three times. He always voted in person. He denied signing an absentee ballot application for the 2015 municipal election and stated the signature on the application was not his. The signatures on the envelopes in which the ballots were placed were not his. He gave no one permission to fill out an absentee ballot application for him. He gave no one permission to vote on his behalf. . . .

"Hoti's true signature appeared on the voter registration card. However, the voter registration card signature did not match the signatures on the ballot application nor the signatures on the ballot sets. The town clerk's office placed the initials 'JM' on Hoti's application, which indicates that the defendant or one of his associates delivered the application. . . .

"Scott Branfuhr is a legal investigator for the State Elections Enforcement Commission [(SEEC)]. He has been involved in over 400 investigations. On December 3, 2015, the [SEEC] received a complaint from the Stamford Republican Registrar of Voters, Lucy Corelli, a public official. . . . Corelli alleged that an individual named Shkadran Hoti voted twice in the 2015 Stamford municipal election . . . once by absentee ballot and once by voting in person. Shkadran Hoti explained that he arrived at his polling place to vote in person but was denied because he was marked off as having already voted by absentee ballot. He protested and was allowed

to vote after completing an affidavit in which he stated he did not vote by absentee ballot.

"Branfuhr compared the absentee ballot application signatures of Isen Hoti and Shkadran Hoti to the signatures on their voter registration cards. Isen's signature on his voter registration card did not match the signature on the absentee ballot application. Shkadran's signature on his voter registration card did not match the signature on the absentee ballot application.

"Branfuhr then obtained all ballot applications containing the initials JM or JL. He also obtained voter registration cards for each individual whose application contained the initials JM or JL. None of the signatures on the absentee ballot applications were similar to the true signatures of those same individuals on their voter registration cards.

"A total of thirty-one applications were marked with the initials JM or JL. The handwriting was similar on all of the applications. Branfuhr's investigation revealed what he called a 'scheme' between [the defendant], as chairman of the Stamford Democratic City Committee and Loglisci, the Stamford town clerk. The 'scheme' involved the submission of thirty-one fraudulent absentee ballot applications and twenty-six fraudulent absentee ballots to the Stamford town clerk's office. The goal of the scheme was to count the fraudulent ballots as valid votes, first to be recorded by the registrar of voters, a public office. Ultimately, the Secretary of the State's office, a governmental entity, records the results of the election.

"Branfuhr said the case was the most 'severe' case he had seen in his nine year career with the [SEEC]. The [SEEC] found [the defendant], Loglisci and Pesiri liable, but only [the defendant's] matter was referred to the state's attorney's office for prosecution. Branfuhr explained that [the defendant's] conduct constituted

felonies but Loglisci's conduct constituted misdemeanors. The [SEEC] suspends enforcement actions when criminal matters are pending. The [SEEC] plans further enforcement action against Loglisci. . . .

"Greg Kettering is a handwriting and document examination expert. Kettering retired from the state police Forensic [Science] Laboratory in 2021. He was the chief handwriting and document examiner for the state of Connecticut. He had extensive specialized training in handwriting and document analysis and had conducted at least 1500 examinations. Handwriting analysis is a highly specialized discipline, and experts are trained to look at different fundamentals of handwriting. The fundamentals include slant, shape, space, use of margins, use of baseline, feather strokes, termination strokes, entry strokes, and the size of letters compared to other letters. In comparing handwriting submissions, Kettering examined, among other indicators, 'speed, proportion, pressure and design.' He spent approximately forty hours on every suspect ballot submission.

"Kettering compared handwriting samples, referred to as 'exemplars,' given by [the defendant] to the *handwritten* information, referred to as 'entries,' on the absentee ballot applications. ([The defendant] provided handwriting samples by writing the names in print and cursive of each of the questioned absentee ballot applicants.) Kettering also compared the handwritten information on the applications to the *signatures* on the applications.

"1. There were 'indications' that the questioned signature of 'Isen Hoti' and the defendant's exemplars share common authorship. There were indications that the questioned entries in the Isen Hoti application and the defendant's exemplars share common authorship.

"2. There were indications that the questioned signature of 'Patricia Velaj' and the defendant's exemplars

share common authorship. There were indications that the questioned entries of Patricia Velaj and the defendant's exemplars share common authorship.

"3. There were indications that the questioned signature of 'Nedzmije Vrzivoli' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Nedzmije Vrzivoli and the defendant's exemplars share common authorship.

"4. There were indications that the questioned signature of 'Blerim Vrzivoli' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Blerim Vrzivoli and the defendant's exemplars share common authorship.

"5. There were indications that the questioned signature of 'Gjinji Agron' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Gjinji Agron and the defendant's exemplars share common authorship.

"6. There were indications that the questioned signature of 'Avdi Gjinji' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Avdi Gjinji and the defendant's exemplars share common authorship.

"7. There were indications that the questioned entries of 'Tone Shtufag' and the defendant's exemplars share common authorship. However, the questioned Tone Shtufag signature could not be 'intercompared' to the defendant's exemplars.

"8. There were indications that the questioned signature of 'Martha Pepaj' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Martha Pepaj and the defendant's exemplars share common authorship.

"9. There were indications that the questioned signature of 'Josephine Mallozzi' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Josephine Mallozzi and the defendant's exemplars share common authorship.

"10. There were indications that the questioned signature of 'Linda Tomaj' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Linda Tomaj and the defendant's exemplars share common authorship.

"11. There were indications that the questioned signature of 'Alexander Velaj' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Alexander Velaj and the defendant's exemplars share common authorship.

"12. There were indications that the questioned signature of 'Avni Ukperaj' and the defendant's exemplars share common authorship. There were indications that the questioned entries of Avni Ukperaj and the defendant's exemplars share common authorship.

"13. There were indications that the questioned signature of 'Isaku Toshe' and the defendant's exemplars share common authorship. There were indications that the questioned entries of lsaku Toshe and the defendant's exemplars share common authorship.

"14. There were indications that the questioned signature of 'Isaku Burim' and the defendant's exemplars share common authorship. There were indications that the questioned entries of lsaku Burim and the defendant's exemplars share common authorship.

"The state did not charge the defendant in each instance in which signatures and entries of other individuals and the defendant's exemplars shared common authorship. In each individual instance in which there were indications of common authorship, the evidence falls far short

of a *definite* conclusion. However, *in all instances taken together*, it was virtually certain and highly probable that the exemplars, entries and signatures shared a common author." (Emphasis altered.)

On the basis of the foregoing, the court found the defendant guilty of all charges and rendered judgment accordingly. The court thereafter sentenced the defendant to a total effective sentence of thirteen months of incarceration, execution suspended, followed by two years of probation, and ordered the defendant to pay a fine of $35,000. This appeal followed.

I

The defendant first claims that the evidence presented at trial was insufficient to support his conviction.[1] Notably, the defendant does not argue that the state failed to prove a specific element of the crimes of which he was convicted.[2] Rather, the defendant argues that the state failed to prove beyond a reasonable doubt that he was the author of the forged signatures. In other words, the defendant seems to contend that the evidence was insufficient to support his conviction

---

[1] For jurisprudential reasons, we address the sufficiency of the evidence claim first, although this differs from the order that the claims were presented by the defendant in his principal appellate brief.

[2] General Statutes § 9-359a provides in relevant part: "(a) A person is guilty of false statement in absentee balloting when he intentionally makes a false written statement in or on or signs the name of another person to the application for an absentee ballot or the inner envelope accompanying any such ballot, which he does not believe to be true and which statement or signature is intended to mislead a public servant in the performance of his official function. . . ."

General Statutes § 53a-139 provides in relevant part: "(a) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed . . . (3) a written instrument officially issued or created by a public office, public servant or governmental instrumentality . . . ."

because the state failed to prove identity.[3] We are unpersuaded.

"[T]he question of identity of a perpetrator of a crime is a question of fact that is within the sole province of the [trier of fact] to resolve. . . . To determine whether the evidence was sufficient to establish the essential element of identity, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . In doing so, we are mindful that the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Abraham*, 343 Conn. 470, 476, 274 A.3d 849 (2022).

The defendant argues that the evidence was insufficient to support his conviction because Kettering's report concluded that, when reviewing each ballot individually, there were indications that the defendant was the author but there was not enough evidence to reach a definite conclusion. The defendant argues that Kettering's testimony that, based upon the totality of the evidence, it was "highly probable that the [defendant's] signature exemplars and the question[ed] documents shared a common author," was not a proper evidentiary basis for guilt as to each individual ballot.

"[Although] [e]vidence [that] is offered and admitted for a limited purpose only . . . cannot be used for

---

[3] We note that the defendant devotes only two paragraphs of his appellate brief to his sufficiency claim.

another and totally different purpose"; (internal quotation marks omitted) *State* v. *Robles*, 348 Conn. 1, 21, 301 A.3d 498 (2023); the finder of fact "is [otherwise] free to consider *all* of the evidence adduced at trial in evaluating the defendant's culpability, and presumably does so . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Sabato*, 321 Conn. 729, 742, 138 A.3d 895 (2016).

Defense counsel did not, at trial, ask that the evidence as to each ballot be limited only to the counts specifically identifying each ballot. Although defense counsel objected to Kettering's testimony as to common authorship based on the totality of the ballot documents on other grounds, he did not argue to the trial court that Kettering's opinion was an improper consideration in determining the defendant's guilt as to each count.

In support of his claim, the defendant cites *State* v. *Juan A. G.-P.*, 346 Conn. 132, 180, 287 A.3d 1060 (2023), for the proposition that, "[w]hen charges involve different victims, the [trier of fact] must also . . . separately consider the charges relating to each victim, and the evidence pertaining to each victim must be clearly distinguished." (Internal quotation marks omitted.) *Juan A. G.-P.* does not hold that the trier of fact is precluded from considering all evidence presented at trial when determining the guilt or innocence of the defendant as to each victim. Indeed, the court referenced instruction 2.6-11, now instruction 2.2-6, of the Connecticut model criminal jury instructions, which provides that the jury "may find that some of the evidence applies to more than one count of the information. The evidence, however, must be considered separately as to each element in each count." (Internal quotation marks omitted.) Id. Thus, as stated herein, where there has been no limitation on the admission of evidence, it is the obligation of the trier of fact to consider all of the evidence in its

determination of whether the state has met its burden of proof.

Moreover, as the state aptly points out, Kettering's testimony that the totality of the evidence proved that the author of the exemplars also authored the ballots at issue was not the only evidence of the defendant's guilt. In addition to Kettering's findings that the ballots and the defendant's exemplars contained indications of common authorship, Loglisci testified that she gave ballots to the defendant and his associates, Pesiri confirmed that she prepared ballots for the defendant to pick up and that she put his initials on those ballots, and Branfuhr testified that the ballots that bore the defendant's initials appeared to share similar handwriting. On the basis of that evidence, which demonstrated that the ballots in question had been given to the defendant and the handwriting on them was similar to the defendant's handwriting, the court reasonably could have inferred that the defendant was the individual who forged them. Accordingly, the defendant's claim that there was insufficient evidence to support his conviction fails.

II

The defendant next claims that the court improperly permitted the state to amend its information in the middle of trial to include the names of the alleged victims of each count of false statement in absentee balloting. We disagree.

The following additional procedural history is relevant to this claim. On January 30, 2019, the defendant was arrested by warrant on fourteen counts of false statement in absentee balloting and fourteen counts of forgery in the second degree. The arrest warrant affidavit contained the names of thirty-four individuals on whose behalf the ballots in question were submitted to the Stamford town clerk's office. According to the

affidavit, SEEC investigators attempted to contact those individuals and the SEEC investigators learned that fourteen of them, who are identified in the affidavit, did not complete absentee ballot applications or vote by absentee ballot in 2015. It was averred in the affidavit that, according to Kettering, those fourteen ballots, and the defendant's exemplars, contained indications of common authorship. Each count of the state's original information specified the date, place and nature of the charged offense but did not identify the names of any of the individuals that appeared on the ballots and ballot applications in question.

On the first day of trial, after the clerk read the information into the record, defense counsel orally moved to dismiss all of the charges against the defendant on the grounds that the information was deficient in that none of the counts identified the individuals on whose behalf the allegedly fraudulent documents were filed, and the forgery counts failed to include a citation to the specific subdivision of § 53a-139 (a) under which the defendant was being charged. The court explained that the defendant had an opportunity to file a bill of particulars, but failed to do so, and denied the defendant's motion as untimely.

On the second day of trial, the prosecutor orally moved to amend the state's information to include "the alphanumerical designation for the subsection" of the forgery statute pursuant to which the defendant was being charged. In other words, whereas the original information charged the defendant with forgery in the second degree in violation of § 53a-139, the amended information charged the defendant with forgery in the second degree in violation of § 53a-139 (a) (3). Defense counsel had no objection to the state's amendment but renewed his "objection" as to the lack of individual names associated with each count of the information.

The court indicated that "it would certainly be necessary in order for the court to make factual findings, to know which individuals the counts refer." The prosecutor objected on the ground that the identity of the victim was not an element of the offenses charged and, therefore, was not required to be included in the information. The prosecutor assured the court that the state would present evidence as to the identity of victims. The court replied, "[t]hat's what the court wanted to know," and continued with the trial.

Following the third day of trial, the court, through the clerk of the court, contacted both counsel, and directed the state to file an amended information to add an individual name for each count of the charge of false statement in absentee balloting. On the morning of the fourth day of trial, the court explained: "The court made such contact because . . . the court determined that it would be inappropriate for the court to fill in the names of the individuals whose signatures were allegedly forged. So, the court was not going to select fourteen names out of the number of alleged forged signatures. The court instructed [the clerk] to inform counsel that the court needed names for each of the counts. Specifically, the counts alleging false statement [in] absentee balloting." Defense counsel acknowledged that the amendment was "exactly what [he] asked" the state to do on the first and second days of trial but, nevertheless, objected to the amendment on the grounds that the state failed to demonstrate good cause for the amendment, as required by Practice Book § 36-18, and that the defendant would be prejudiced by it on the fourth day of trial.[4]

---

[4] Defense counsel also argued that he had no notice or opportunity to be heard as to six of the names added to the state's amended information. He never identified those six names, and the defendant has not reasserted that argument on appeal.

The court overruled defense counsel's objection on the grounds that the defendant had been apprised that Branfuhr had identified thirty-one suspect ballots and that the state was pursuing charges on fourteen of those ballots, all of which were identified in the arrest warrant affidavit. The court also noted that none of the witnesses who already had testified could have "testified about signatures in any significant way . . . ."

On appeal, the defendant claims that the court "erred in allowing the state to amend its long form information [in the middle] of trial, where the state did not provide a 'good cause' for such an amendment" pursuant to Practice Book § 36-18. Section 36-18 provides in relevant part: "After commencement of the trial for good cause shown, the judicial authority may permit the prosecuting authority to amend the information at any time before a verdict or finding if no additional or different offense is charged and no substantive rights of the defendant would be prejudiced. . . ." Here, the court did not permit the state to amend its information; it directed the state to do so. Accordingly, the state was not required to show good cause.

Moreover, the amendment directed by the court, which was specifically requested by defense counsel earlier in the trial, did not charge an additional or different offense, nor did it prejudice any substantive rights of the defendant. Indeed, the amendment narrowed the charges against the defendant, allowing defense counsel to focus on the specific ballots identified in the amended information. As the court aptly found, the identities of all of the victims were known to the defendant since the date of his arrest because their names were listed in the arrest warrant affidavit. The defendant also was apprised of those identities when Kettering's case notes were disclosed to defense counsel prior to trial. The defendant does not contend otherwise.

Accordingly, the defendant's claim that the court improperly permitted the state to amend its information is unavailing.

### III

The defendant next claims that the court improperly denied him "an opportunity to obtain and disclose a handwriting expert where the state's handwriting expert's testimony at trial diverged from the findings in his previously disclosed report and where the expert's conclusions at trial were completely different from those in the disclosed report." We are not persuaded.

The following additional procedural history is relevant to this claim. As noted herein, the defendant was arrested by warrant in January, 2019, and the warrant affidavit identified Kettering as the document examiner at the state laboratory who was examining the ballots at issue. According to the affidavit, as of December 1, 2017, Kettering "was still going through them due to the large number of ballots but he could say it appears the same individual filled out the majority of the ballots sent up but would need handwriting samples from a suspect in order to complete the comparison." The affidavit later set forth Kettering's conclusion that " 'the totality of the case points strongly toward [the defendant] as having authored the ballots in question.' "

Prior to trial, the state timely disclosed its intent to call Kettering as an expert witness on handwriting analysis and provided to defense counsel Kettering's case notes related to the ballots in question. In Kettering's case notes, he set forth his analysis and conclusions as to each of the ballots in question. As to several of them, he found that there were " 'indications' " of common authorship with the exemplars provided by the defendant, but he further concluded that those indications, as to each individual ballot, were not sufficient to form a definite conclusion.

On February 9, 2022, the state filed a motion seeking disclosure of the defendant's intention to offer expert testimony.[5] The defendant neither disclosed an expert of his own, nor did the defense seek to speak to Kettering regarding his opinions in this case.

On the third day of trial, the prosecutor called Kettering as the state's final witness. Defense counsel objected to Kettering testifying as an expert witness on the ground that "the trier of fact may himself determine handwriting." The court overruled defense counsel's objection. That day, the prosecutor began his direct examination of Kettering. Due to scheduling issues, there was a one month delay until the trial resumed. When the trial resumed, Kettering's direct examination continued and he explained his analyses for each of the fourteen ballots identified in the state's amended information, concluding that there were indications of common authorship between those ballots and the handwriting exemplars provided by the defendant. He explained the various levels of certainty that handwriting experts ascribe to their findings and that those levels are determined based upon the number of similarities between the compared samples. He testified that, when comparing the handwriting on each of the ballots at issue to the exemplars provided by the defendant, there were indications of common authorship but, due to the

---

[5] Practice Book § 40-26 provides in relevant part: "Upon written request by the prosecuting authority filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the defendant, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing to the prosecuting authority the existence of and make available for examination and copying in accordance with the procedures of Section 40-7 the following items . . . (2) Any reports or statements of experts made in connection with the case, including results of physical or mental examinations and of scientific tests, experiments or comparisons, which the defendant intends to offer in evidence at trial or relating to the anticipated testimony of a person whom the defendant intends to call as a witness."

limited number of similarities, "the evidence falls far short of . . . a definite conclusion." Kettering further explained, however, that when comparing all of the handwriting on all of the ballots to the exemplars, he found approximately 178 similarities, making it "virtually certain [and] highly probable" that the ballots in question and the defendant's exemplars shared a common author.

On cross-examination, defense counsel questioned Kettering at length as to the findings contained in his case notes and the lack therein of any findings based upon an examination of all of the ballots and exemplars. Defense counsel orally moved to strike Kettering's testimony "as it pertains to any conclusion that's not found in [Kettering's] reports." Defense counsel argued that "[t]he reports were disclosed to us, we're entitled to rely on them," and "we were never provided with a formal Practice Book compliant disclosure for an expert. . . . [T]his is the first time anybody is hearing anything about these types of conclusions." In response, the prosecutor argued that the state had disclosed Kettering on its witness list months earlier, and, "[i]f there were questions that [defense counsel] wanted to ask [Kettering], he was free to do so." The court denied the defendant's motion to strike and defense counsel continued with cross-examination of Kettering.

After the luncheon recess on the fifth day of trial, defense counsel indicated that he would like to call his own expert witness to respond to Kettering's opinion that his comparison of the handwriting on all of the ballots to the exemplars indicated that it was "virtually certain [and] highly probable" that they shared a common author. Defense counsel argued that he had "not seen this conclusion, this methodology anywhere in any of the documents we've been provided with, and it's the polar opposite conclusion of the ones that this witness has come to, and we've had in our hands for a

long time. I think the record is clear that the first time anybody's ever heard about that was yesterday. So, in anticipation of counsel being late on this, I'd like the record to reflect that everything in front of me, and all the reports, point to a different conclusion that this court may consider."[6]

In response, the prosecutor argued that Kettering's examination of the documents and his conclusion was known to the defendant when he was arrested in 2019 and defense counsel could have discussed Kettering's findings with him at any time since then, but he never sought to do so. The prosecutor argued that the defendant had not disclosed an expert and only provided the state with a witness list on the third day of trial. The prosecutor noted that Kettering testified that he spent one and one-half years investigating this case and writing his report and that it was disingenuous to contend that a defense expert could render an opinion at trial in only one hour that rebuts Kettering's testimony, which spanned three days.

---

[6] Defense counsel stated his "intention . . . to attempt to call our own expert for the purposes of clarifying the procedural rules and the [standard industry procedures] that the current witness is operating under, and whether or not such a conclusion is viable." Defense counsel explained to the court, inter alia, that he had been "diligently searching since yesterday night" and that "it's very difficult to get an expert to do anything, especially on short notice. I may have an outside chance of providing limited one hour of testimony, limited both in time and also in substance, [it] would not be an expert witness, if I can, in fact, get them here—[it] would not be an expert witness. It would be doing charts and his own analysis. No opinions on that would be delivered. But there's been some sophisticated terms and themes have arisen in this case, including natural range of variation, what needs to be documented [and] [w]hat doesn't need to be documented. Following of procedures, the cut and paste of the suite docs that I think would certainly inform the court and go beyond . . . the average individual, especially with respect to averaging the way this witness has testified on average.

"So, I'd like to inform the court that we'd like to call our expert. I'd like to provide a [curriculum vitae] to counsel, as early as the break, or by the end of the day for that limited testimony, which, further complicating things, I believe I can only have the witness appear by Zoom."

The court denied defense counsel's request to present a defense expert. In so doing, the court reasoned that, when the state discloses an expert witness, it typically means that the state is going to rely heavily on expert testimony to prove its case and that anticipated reliance should prompt the defense to retain its own expert witness so it is prepared to challenge the testimony of the state's expert. The court noted that "[t]his case is essentially seven years old. There has been no expert disclosed to the state." The court further noted that the anticipated testimony of a defense expert could not take the one hour that was proposed by defense counsel.[7]

The defendant claims that the court abused its discretion in denying defense counsel's request to present a defense expert. Our rules of practice require a defendant to disclose to the state, within forty-five days of a written request, the names of any witnesses the defendant intends to call at trial; Practice Book § 40-13;[8] in

[7] Specifically, the court reasoned: "What counsel is suggesting is, we want to bring in an expert to ask this question. Have you ever heard of this aggregate theory? Now let's explore the answers. No, I've never heard of it. Do you think that that aggregate theory is a bogus theory? I've never heard of it.

"And, so, where does it go from there? Do you think if this expert used the aggregate theory, his conclusions are suspect? Well, I would have to see the entire, basically, experiment to determine whether I would have come out the same way, whether he used that theory or not.

"You'd have to do the whole thing over again to see if it makes a difference whether this expert used what has been deemed an aggregate theory, and the other expert would have to testify, he used another kind of theory, or didn't use another theory at all.

"So, when you know who your opponent is, you prepare for your opponent. You don't have to know every point he's going to throw, to use a boxing analogy. You know my opponent is so and so. It's likely that the expert you call may be familiar with the state's expert.

"But, the seminal question would be, have you ever heard of this aggregate theory? And, then, where you go from there will lead to having to conduct the analysis all over again. That request is denied."

[8] Practice Book § 40-13 (b) provides: "Upon written request by the prosecuting authority, filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the defendant, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of

addition to, inter alia, "[a]ny reports or statements of experts made in connection with the case . . . ." Practice Book § 40-26 (2).[9] The failure to comply with those rules may result, inter alia, in the preclusion of specific evidence. Practice Book § 40-5.[10] This court previously has explained: "Practice Book § 40-5 [grants] broad discretion to the trial judge to fashion an appropriate remedy for noncompliance with discovery. . . .

"Appellate review of a trial court's remedy for noncompliance with discovery, [a]s with any discretionary action of the trial court . . . requires every reasonable presumption in favor of the action, and the ultimate issue is whether the trial court could reasonably conclude as it did. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or

the request, unless such time is extended by the judicial authority for good cause shown, disclose to the prosecuting authority the names and, subject to the provisions of subsection (g) of this section, the addresses of all witnesses whom the defendant intends to call in the defendant's case-in-chief and shall additionally disclose to the prosecuting authority any statements of the witnesses other than the defendant in the possession of the defendant or his or her agents, which statements relate to the subject matter about which each witness will testify."

[9] Practice Book § 40-26 provides in relevant part: "Upon written request by the prosecuting authority filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the defendant, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing to the prosecuting authority the existence of and make available for examination and copying in accordance with the procedures of Section 40-7 the following items . . . (2) Any reports or statements of experts made in connection with the case . . . ."

[10] Practice Book § 40-5 provides in relevant part: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it deems appropriate, including, without limitation . . . (4) Prohibiting the non-complying party from introducing specified evidence . . . ."

irrelevant factors." (Citations omitted; internal quotation marks omitted.) *State* v. *Billings*, 217 Conn. App. 1, 43–44, 287 A.3d 146 (2022), cert. denied, 346 Conn. 907, 288 A.3d 217 (2023). "When this court reviews a decision of the trial court for abuse of discretion, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable. . . . Accordingly, the abuse of discretion standard reflects the context specific nature of evidentiary rulings, which are made in the heat of battle by the trial judge, who is in a unique position to [observe] the context in which particular evidentiary issues arise and who is therefore in the best position to weigh the potential benefits and harms accompanying the admission of particular evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Wright*, 320 Conn. 781, 832, 135 A.3d 1 (2016).

As previously stated in this opinion, the defendant was aware of the state's reliance on Kettering's opinions since he was arrested in January, 2019. According to the 2019 arrest warrant affidavit, Kettering had specifically concluded that " '*the totality of the case* points strongly toward [the defendant] as having authored the ballots in question.' " (Emphasis added.) The defendant therefore had notice of Kettering's conclusion that *all* of the evidence strongly implicated him because Kettering's conclusion had been disclosed in the arrest warrant affidavit, which had been served more than three years prior to trial. Nevertheless, the defense did not seek to discuss Kettering's opinions with him or retain its own expert to rebut them. We therefore reject the defendant's argument that he was "sandbagged" by Kettering's testimony.

In his brief to this court, the defendant contends that he "was ready to disclose [his] expert immediately and

have him testify, albeit remotely, within the confines of the allocated trial dates in this case." The defendant claims that his expert "would have opined on the propriety or legitimacy of 'aggregating' multiple signatures to arrive at a conclusion of the author's identity." These assertions are belied by the record. In stating his intention to call his own expert, defense counsel did not provide such definite assurances to the trial court. Defense counsel did not disclose the name of his intended expert, and he did not proffer a curriculum vitae or a summary of the expert's proposed opinion. Rather, as recounted herein, defense counsel asserted that he "[would] like" to provide an expert's curriculum vitae that afternoon and vaguely suggested that his expert would perhaps provide one hour of testimony. As the prosecutor aptly pointed out when he objected to the defense's attempted late disclosure, Kettering spent years examining the evidence in this case and had, at that point, provided three days of testimony during trial. It was unlikely that an expert could render a rebuttal opinion in the one hour indicated by defense counsel, and such testimony would then have necessitated a response by Kettering, which would have disrupted and delayed the proceedings in a manner not contemplated by defense counsel.

On the basis of the foregoing, we cannot conclude that the court abused its discretion in denying defense counsel's request to present undisclosed expert testimony on the fifth day of trial, especially in the absence of any meaningful proffer as to the substance of that opinion.

IV

The defendant also claims that "the Connecticut rules of criminal procedure violated [his] due process rights where the disclosure rules do not mandate advance

notice as to the sum and substance of an expert's testimony and/or the expert's conclusions/opinions."[11] Although the defendant failed to preserve this claim at trial, we address it under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, as modified in *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 239–40, as modified in *In re Yasiel R.*, supra, 781. "The first two [*Golding*] requirements involve a determination of whether the claim is reviewable; the second two requirements involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Mitchell*, 170 Conn. App. 317, 322–23, 154 A.3d 528, cert. denied, 325 Conn. 902, 157 A.3d 1146 (2017).

In claiming that his right to due process was violated by the lack of a rule of practice requiring the state to disclose the substance of the opinions of its expert witnesses, the defendant essentially is alleging a constitutional right to discovery. Because a criminal defendant has no general constitutional right to discovery;

---

[11] The defendant argues that, due to the absence of such a rule, "if [a state's] expert has not prepared a report, he or she need not be disclosed as an expert, and [his or] her opinion can be shrouded in mystery until the stand is taken." These arguments do not apply to the defendant because Kettering's identity and opinions in this case were disclosed as early as the service of the arrest warrant and were supplemented by the state's production to the defendant of Kettering's case notes.

*Weatherford* v. *Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977); the defendant's claim is not of constitutional magnitude alleging the violation of a fundamental right, and, accordingly, fails under the second prong of *Golding*.

V

The defendant next claims that his right to confrontation under the sixth amendment to the United States constitution[12] was violated because the court declined to strike Pesiri's testimony, which was provided in the state's case-in-chief, after she asserted her fifth amendment privilege against self-incrimination and declined to testify when the defense called her as a witness in the defendant's case. We are not persuaded.

Pesiri testified during the state's case-in-chief on July 27, 2022. On direct examination, she testified, in sum, that she worked in the town clerk's office under Loglisci's supervision, and that she prepared ballot sets for the defendant to pick up. She stated that, when employees in the office saw or were told that the defendant had delivered applications, Pesiri wrote the defendant's initials on the upper right-hand corner of the applications. On cross-examination, defense counsel asked Pesiri, inter alia, whether she ever reported Loglisci for her improper handling of the absentee ballots, and whether there was anything that stopped Pesiri from doing so. Defense counsel also asked Pesiri about her knowledge of the SEEC investigation, including whether she knew she was a potential respondent in that investigation and whether she cooperated with the investigation. Defense counsel asked Pesiri about the various communications that she had with Branfuhr

---

[12] "The right to confrontation guaranteed by the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment." *State* v. *Robles*, 348 Conn. 1, 5 n.4, 301 A.3d 498 (2023).

throughout the SEEC investigation and the written statement that she gave in that investigation.

On August 30, 2022, the prosecutor rested the state's case-in-chief and the defense began its case the next day. In the intervening month between Pesiri's testimony and the commencement of the defendant's case, it came to the court's attention that the Federal Bureau of Investigation (FBI) was investigating the Stamford town clerk's office regarding the 2017 municipal election. In light of the pending FBI investigation, as well as testimony from Branfuhr that the SEEC investigation was ongoing, the court informed the parties that it would be advising any witnesses from the Stamford town clerk's office of their fifth amendment rights. Neither party objected to this procedure.

The following day, the prosecutor orally moved to preclude any inquiry regarding the investigation of the 2017 election on the ground that it was irrelevant to the prosecution in this case, which relates to the 2015 election. The prosecutor also argued that, to the extent that questions regarding the 2017 election were relevant for impeachment purposes, any probative value was outweighed by their prejudicial impact. Defense counsel objected to the state's motion, arguing that an inquiry into the 2017 investigation was relevant to expose witnesses' "interest in telling a story in a certain way to avoid liability or exposure. So, that's the real relevance here. It's not for impeachment purposes." Defense counsel asserted that the witnesses "have an interest of pointing away from themselves about what happened in 2015 so as to avoid uncovering what happened in 2017 . . . ." The court granted the state's motion, explaining that "[b]ias, interest, and motive have been fully explored on cross-examination."

Defense counsel then called Pesiri to testify. The court canvassed Pesiri on her fifth amendment rights

and she declined to testify. Defense counsel moved to strike Pesiri's earlier testimony claiming that her assertion of her fifth amendment privilege, when recalled as a defense witness, violated the defendant's sixth amendment right to confrontation. Defense counsel maintained that he had a right to recall Pesiri so that he could, among other things, impeach her credibility using transcripts of her earlier trial testimony. Defense counsel argued that the defendant had "a consistent and persistent right to expect the ability to impeach [Pesiri] by her own testimony and through others and test the truthfulness of what she said on the stand. I shouldn't be hampered by that, by expecting that, because I had a long cross-examination. . . . [A]s a practical matter, we investigate statements. You see it's very common . . . we have paid for transcripts. We have done other investigation. We have heard other things in the trial past what . . . Pesiri has testified about that could be linked up to her impeachment to test the credibility that she has for truthfulness."

The court denied the motion to strike, explaining: "The opportunity to cross-examine is not unlimited. The opportunity to examine an adverse witness by leading questions is not unlimited. It is this court's view that, in this case, there is every indication that the testimony of . . . Pesiri as an adverse witness would be cumulative to her cross-examination as the state's witness."

On appeal, the defendant reiterates his claim that his constitutional right to confrontation was violated when Pesiri asserted her fifth amendment right and declined to testify. "[T]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an

important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Additionally, [a]lthough it is within the trial court's discretion to determine the extent of cross-examination . . . the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . The right of confrontation is preserved [however] if defense counsel is permitted to expose to the [court] the facts from which [it], as the sole trier of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . .

"If a defendant's cross-examination is restricted by the competing fifth amendment right of a witness, it may be necessary to strike the direct testimony of that witness. . . . [T]he sixth amendment is violated only when assertion of the privilege undermines the defendant's opportunity to test the truth of the witness' direct testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 791–92, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010).

Here, as the court aptly explained, the defense had ample opportunity to cross-examine all aspects of Pesiri's testimony that was elicited on direct examination during the state's case-in-chief. In fact, as noted herein, defense counsel questioned Pesiri on cross-examination relating to the SEEC investigation in this case and her various communications with Branfuhr and the written statement that she provided to him. The defense

had an unrestricted opportunity to explore on cross-examination any motive or bias that Pesiri may have had and to impeach any portion of her testimony on direct examination. We therefore conclude that the defendant's right to confrontation was not violated. Accordingly, the court's denial of the defendant's motion to strike Pesiri's testimony was not improper.

## VI

The defendant finally claims that the court improperly denied his motion to dismiss based upon his allegation of selective prosecution. We disagree.

Defense counsel moved to dismiss the charges against the defendant on the ground that the state engaged in selective prosecution because the state could have prosecuted Loglisci because she was named as a respondent by the SEEC and was liable for her role in what the SEEC called a scheme to have invalid votes counted in the 2015 municipal election. Defense counsel argued that the defendant was singled out for prosecution because he did not cooperate with the SEEC investigation and exercised his constitutional rights to counsel and to remain silent.

In denying the defendant's motion, the court first found that the defendant and Loglisci were similarly situated in all relevant aspects because both were involved in Stamford party politics, both were involved with handling the absentee ballot applications and ballot sets, Loglisci's office placed the defendant's initials on ballot applications that he or his associates delivered to the town clerk's office to facilitate the distribution of ballot sets that should not have been issued, Loglisci allowed the defendant to pick up ballots even though the applications for those ballots should have been rejected, and both were named as respondents in the SEEC investigation.

Despite that determination, the court concluded that the defendant was not singled out for prosecution because he invoked his rights to counsel or to remain silent. The court reasoned that "[t]he [SEEC] plans further enforcement action against Loglisci once the instant matter is resolved. The [SEEC] also concluded that, initially, it would refer felonies for prosecution rather than misdemeanors. The [SEEC] deemed the defendant, not Loglisci, liable for felonies. Finally, the defendant's alleged forgeries distinguish his conduct from Loglisci's. By the defendant's hand alone, [twenty-six] people could have had their civil right to vote extinguished." The court therefore concluded that the defendant was not selectively prosecuted and denied his motion to dismiss.

On appeal, the defendant claims that the court improperly rejected his claim of selective prosecution, arguing that the court ignored the allegations of a " 'scheme' " that allegedly involved several individuals, all of whom, he contends, were similarly situated, and that the only difference between him and those other individuals was that he was the only one who exercised his right to counsel.

"In cases in which the defense of selective prosecution has been asserted, before a motion to dismiss can be granted, the defendant must prove (1) that others similarly situated have generally not been prosecuted and that he has been singled out and (2) that he is the victim of invidious discrimination based on impermissible considerations such as race, religion, or the exercise of a constitutionally protected right." (Internal quotation marks omitted.) *State* v. *Payne*, 100 Conn. App. 13, 19, 917 A.2d 43, cert. denied, 282 Conn. 914, 924 A.2d 139 (2007). "[A]bsent a showing of a selection deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification . . . conscious selectivity in enforcement of the law is not

in itself a constitutional violation." (Internal quotation marks omitted.) Id., 25–26.

"To establish an actual vindictive motive, a defendant must prove objectively that the prosecutor's charging decision was a direct and unjustifiable penalty . . . that resulted solely from the defendant's exercise of a protected legal right . . . . Put another way, the defendant must show that (1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a stalking horse, and (2) [the defendant] would not have been prosecuted except for the animus." (Internal quotation marks omitted.) *State* v. *Lee*, 86 Conn. App. 323, 328, 860 A.2d 1268 (2004), cert. denied, 272 Conn. 921, 867 A.2d 839 (2005). "A . . . court's factual findings on prosecutorial vindictiveness are reviewed for clear error and the legal principles which guide the . . . court are reviewed de novo." (Internal quotation marks omitted.) Id., 326.

Here, the defendant argues that he was selectively prosecuted because he exercised his right to counsel. In so arguing, the defendant ignores the difference between his conduct and that of the other individuals whom he claims were similarly situated. As the court aptly found, the defendant was the one who fraudulently filled out the absentee ballot applications and forged the signatures of the victims. Moreover, the defendant's claim is devoid of any argument of animus or invidious discrimination on the part of the state. We therefore conclude that the court properly rejected the defendant's claim of selective prosecution.

The judgment is affirmed.

In this opinion the other judges concurred.